HALL et al. v. McKINNON et al.

(Circuit Court of Appeals, Ninth Circuit.  December 4, 1911.)

No. 1,931.

1. APPEAL AND ERROR (§ 402*)—RETURN—FILING—TIME—EXTENSION—AU-
   THORITY OF JUDGE.
   A judge of another district holding court for the resident judge had
   authority to make an order in a case previously tried by the resident
   judge extending the time for the filing of the return to a writ of error,
   the citation for which had been signed by the resident judge.
   [Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 402.*]

2. MINES AND MINERALS (§ 18*)—PLACER CLAIM—LOCATION—EXTENT.
   Under the express provisions of Rev. St. §§ 2330, 2331 (U. S. Comp. St.
   1901, p. 1432), the unit of an individual placer mining claim is 20 acres,
   but an association of persons may make a location of a tract which shall
   embrace as many individual claims of 20 acres each as there are individ-
   uals in the association, not to exceed eight locators making a location
   aggregating 160 acres.
   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 29–
   36; Dec. Dig. § 18.*].

3  MINES AND MINERALS (§ 17*)—PLACER CLAIM—LOCATION—DISCOVERY.
   Where eight individuals made an association placer location not ex-
   ceeding 160 acres in area, as authorized by Rev. St. § 2330 (U. S. Comp.
   St. 1901, p. 1432), a discovery of gold in a shaft sunk to a depth of 88
   feet on or near the western boundary line of the location was sufficient to
   support the location of the entire tract.
   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24–
   28; Dec. Dig. § 17.*]

4. TRIAL (§ 285*)—INSTRUCTIONS—EVIDENCE.
   Instructions to juries must be considered with reference to the evi-
   dence to which they relate.
   [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 698, 699; Dec. Dig.
   § 285.*]

5. MINES AND MINERALS (§ 17*)—PLACER CLAIM—DISCOVERY.
   Under Rev. St. § 2320 (U. S. Comp. St. 1901, p. 1424), providing that no
   location of a mining claim shall be made until the discovery of the vein
   or lode within the limits of the claim located, a discovery is as neces-
   sary to the location of a placer claim as to the location of a lode claim.
   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24–
   28; Dec. Dig. § 17.*]

6. MINES AND MINERALS (§ 27*)—PLACER CLAIM—BOUNDARIES—EXTENSION.
   Where the boundaries of a placer mining claim are extended by the
   locator to obtain possession of adjoining ground located in good faith
   by another, the change is invalid, since the entry on ground by a lo-
   cator without a superior right, for the purpose of appropriating an over-
   lapping location, makes him an intruder on the other claim.
   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§
   64, 65; Dec. Dig. § 27.*]

7. MINES AND MINERALS (§ 27*)—PLACER CLAIM—RELOCATION—OVERLAPPING.
   In ejectment to recover possession of certain mining ground within
   an alleged overlapping area of two adjoining placer mining claims, an
   instruction that if defendant's claim as originally located included the
   tract in controversy, and the boundaries thereof were so marked as to
   be readily traceable on the ground during August or September, 1906,
   and such marking was peaceably, and not clandestinely, surreptitious-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ly, or fraudulently done, and was made before plaintiffs made any discovery of gold within the exterior boundaries of their claim, and defendants made a discovery of gold within their claim prior to the date of plaintiffs' discovery within the exterior boundaries of their claim, then it was immaterial whether the original marking of the boundaries of defendants' claim were sufficient to make them readily traceable or **not, was correct.**

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 64, 65; Dec. Dig. § 27.*]

**8.** TRIAL (§ 251*)—INSTRUCTIONS—ISSUES.

In an action to recover possession of certain mining ground, an instruction with reference to the law of dummy location was properly refused, where such question was not made an issue in the pleadings.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 587–595; Dec. Dig. § 251.*]

**9.** MINES AND MINERALS (§ 38*)—LOCATION—ACTIONS—FRAUD—PLEADING.

Since fraud consists in intention which is a fact which cannot be presumed, it cannot be relied on as a defense to an action to recover possession of mining ground unless averred.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 38.*]

In Error to the District Court of the United States for the Fourth Division of the Territory of Alaska.

Action by J. W. Hall and others against A. McKinnon and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

This is an action in ejectment brought in the District Court of Alaska, Fourth Division, by the plaintiffs in error against the defendants in error to recover possession of certain mining ground within an alleged overlapping area of two adjoining placer mining claims, and damages for the withholding. The plaintiffs in error will hereafter be designated as "plaintiffs"; and the defendants in error, the "defendants," as in the court below.

The conflicting claims are the Liberty Association claim, which will hereafter be designated as the "Liberty claim," and the Oregon Association claim, hereafter designated as the "Oregon claim." The plaintiffs own the Liberty claim, and the defendants own the Oregon claim. The claims are located on or near Vault creek, a tributary of the Chatanika river, in the Fairbanks recording district of Alaska. The Liberty claim was staked May 24, 1906, and the boundary lines of the claim plainly marked upon the ground. Gold was discovered in the Liberty claim on October 9 or 10, 1906. The discovery was made in a shaft sunk to a depth of about 80 feet in the ground in controversy. It is claimed by the defendants that the Oregon claim was staked June 16 and 17, 1905; but there is a controversy as to the boundary lines of the claim as staked at that time. Gold was discovered in the Oregon claim in August, 1905, in a shaft sunk to a depth of about 88 feet on or near the western boundary line as claimed by the defendants. The claim was surveyed and the boundaries distinctly marked on the ground in August, 1906. There was evidence on the part of the defendants that the boundaries, as surveyed at the latter date, were identical with those staked on June 16, 1905; while there was evidence on the part of the plaintiffs that the boundaries were not sufficiently staked and marked in June, 1905, and, as surveyed in August, 1906, were materially different from the boundaries as staked in June, 1905. The boundaries of the Oregon claim, as plaintiffs claim it was staked in June, 1905, do not conflict with the Liberty claim; but, as surveyed in August, they do conflict, overlapping the western boundary of the Liberty claim 1,545 feet, the northern boundary 750 feet, the southern boundary 370 feet, and eastern boundary 1,486 feet. The area of the overlap contains about 19 acres, and from this area it is charged that the defendants mined and extracted gold in the aggregate sum

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of $178,375; but, as it is conceded by the plaintiffs that the defendant Beck-ord is the owner of an undivided one-sixth of the ground in dispute, the plaintiffs ask damages against the remaining defendants for five-sixths of the amount extracted, or the sum of $148,645.83.

The case was tried before the court and jury, and a verdict returned in favor of the defendants. The plaintiffs have brought the case here on writ of error.

Louis K. Pratt, T. A. Marguam, and Lorenzo S. B. Sawyer, for plaintiffs in error.

McGinn & Sullivan, Metson, Drew & Mackenzie, and E. H. Ryan, for defendants in error.

Before GILBERT and MORROW, Circuit Judges, and WOL-VERTON, District Judge.

MORROW, Circuit Judge (after stating the facts as above). [1] The defendants in error interpose a motion to dismiss the writ of error on the ground that the record was not filed in this court by or before the return day, and the time for filing the record was not extended by the judge who signed the citation, or by a judge of this court, as required by rule 16 of this court (150 Fed. xxix, 79 C. C. A. xxix). The motion is purely technical and without merit.

It appears that Judge Lyons of the District Court of Alaska, Fourth Division, tried the case at Fairbanks, and signed the citation, and, from time to time, made orders extending the return to the writ of error, including an extension dated November 24, 1910, extending the return date to January 31, 1911. The record was filed in this court December 27, 1910; but it appears that Judge Overfield, holding court for Judge Lyons at Fairbanks, made an intermediate order on August 29, 1910, extending the time for the return of the writ to November 21, 1910. And the objection is made that, as Judge Overfield did not sign the citation and is not a judge of this court, he was not authorized to make this intermediate order of extension of August 29, 1910. He was, however, holding court at Fairbanks and had authority as judge sitting in that court to make any order in the case necessary to protect and preserve the rights of the parties thereto. His order was sufficient, under the circumstances, to extend the return to the writ of error.

The motion to dismiss is therefore denied.

[2] The unit of an individual placer mining claim is 20 acres. Section 2331, R. S. (U. S. Comp. St. 1901, p. 1432). But an association of persons may make a location of a tract which shall embrace as many individual claims of 20 acres each as there are individuals in the association, not to exceed eight locators making a location aggregating 160 acres. Section 2330, R. S. (U. S. Comp. St. 1901, p. 1432); Lindley on Mines, § 448; Morrison's Mining Rights (13th Ed.) p. 215; Costigan on Mining Law, p. 173; Cook v. Klonos, 164 Fed. 529, 90 C. C. A. 403; Nome & Sinook Co. v. Snyder (C. C. A.) 187 Fed. 385.

[3] The Oregon Association claim is a placer mining claim, and as staked in June, 1905, was by eight locators claiming 160 acres. The claim was afterwards surveyed, and, after deducting an overlap

with a prior location, was found to contain something less than 160 acres. Gold was discovered on this claim in August, 1905, in a shaft sunk to a depth of about 88 feet on or near the western boundary line as claimed by the defendants. This discovery was sufficient to support the location of an entire tract of 160 acres. Union Oil Co., 25 Land Dec. Dept. Int. 351; McDonald v. Montana Co., 14 Mont. 88, 35 Pac. 668, 43 Am. St. Rep. 616; Kirk v. Meldrum, 28 Colo. 453, 65 Pac. 633. The tract as surveyed in August, 1906, included the ground in controversy; but the Liberty claim staked May 24, 1906, and a discovery made thereon in October, 1906, also included the ground in controversy. If the boundaries of the Oregon claim as alleged to have been staked by the defendants in June, 1905, were the same as those in August, 1906, then the Oregon Association, having made a location and discovery on that claim prior to the location and discovery made by the Liberty Association on its claim, the right of possession to the ground in controversy was in the former and not in the latter. One of the questions at issue upon the trial of the case was this: Were the boundaries of the Oregon claim sufficiently staked and marked in June, 1905? Another question was: Were the boundaries of the Oregon claim as staked in June, 1905, the same as those surveyed in August, 1906? The locators of the Liberty claim contended that the boundaries of the Oregon claim were not sufficiently staked or marked upon the ground in June, 1905, and that the location of the claim as defendants claimed to have staked it in June, 1905, was not the same as the location marked upon the ground in August, 1906; that the former did not include the ground in controversy, while the latter did. There was evidence to support these contentions, but they were questions of fact for the jury; and upon the trial these questions were submitted to the jury and determined in favor of the Oregon Association. The question here is: Did the court instruct the jury correctly as to the law of the case upon these questions?

The court instructed the jury that a mining claim might be marked upon the ground by stakes or other permanent monuments; but that the law required a claim to be marked so distinctly upon the ground that its boundaries could be readily traced; that the requirements of the statute in this respect were not necessarily fulfilled by merely setting stakes at each of the corners of the claim and at the center of the end lines, unless the topography of the ground and the surrounding conditions were such that a person accustomed to tracing lines of mining claims could, after reading a description of the claim in the posted or recorded notice of location or upon the stakes, by a reasonable and bona fide effort to do so, find all of the stakes or monuments, and thereby readily trace the boundaries; that where the country was broken, or the view from one stake or monument to another was obstructed by intervening timber or brush, it might be necessary to blaze trees along the lines, or cut away the brush, or set more stakes at such distances that they might be seen from one to the other, in a way to indicate the lines so that the same might be readily traced; but it was not for the court to say what was a

sufficient marking. It was the duty of the jury to determine from all the evidence in the case, and from the topography of the ground in question, and the surrounding conditions, whether or not a sufficient marking of the boundaries of the claim was made by the defendants so that they could be readily traced by a person making a reasonable effort to do so.

To these instructions no objection was made, but it was objected that the court proceeded to give a misleading and contradictory instruction and one that did not state the law correctly in the following instruction:

"But if you find from the evidence that the Oregon Association placer claim, as originally located included the tract of mining ground in controversy, and if you further find that the boundaries thereof were not so marked as to make them readily traceable at or about the time of the making of such location, but you do further find that such boundaries were so marked as to be readily traceable upon the ground during the months of August or September, 1906, at the time of the alleged 'Allen survey,' and that such marking was made peaceably, and not clandestinely, surreptitiously, or fraudulently, and was made before the plaintiffs made any discovery of gold within the exterior boundaries of the Liberty Association claim, and you further find that the defendants made a discovery of gold within the limits of said Orgeon Association placer claim prior to the date when plaintiffs made a discovery of gold within the exterior boundaries of the Liberty Association claim, then you are instructed that it is immaterial whether the original marking of the Oregon boundaries were sufficient to make them readily traceable or not."

[4] Instructions to juries must always be considered with reference to the evidence to which they relate. The first important question in this case was priority of discovery.

[5] The first discovery of gold on the Oregon claim was in August, 1905. The first discovery of gold on the Liberty claim was in October, 1906. The priority of right based upon discovery was, therefore, in favor of the Oregon claim. Section 2320, R. S. *(U. S. Comp. St. 1901, p. 1424), provides that:

"No location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located."

In Steele v. Tanana, 148 Fed. 678, 78 C. C. A. 412, this court held that discovery was as necessary to a location of a placer claim as to a location of a lode claim; and in Lange v. Robinson, 148 Fed. 799, 79 C. C. A. 1, this court held that the object of the law in requiring discovery to precede location was to insure good faith upon the part of the mineral locator and to prevent fraud upon the government by persons attempting to acquire patents to land not mineral in character.

In Creede v. Uinta, 196 U. S. 337, 353, 25 Sup. Ct. 266, 273 (49 L. Ed. 501), the Supreme Court, referring to section 2320 of the Revised Statutes and the fact of discovery as relating to the righ of exclusive possession attending a valid location, said:

"It is undoubtedly true that discovery is the initial fact. The language of the statute makes that plain, and parties may not go upon the public domain and acquire the right of possession by the mere performance of the acts prescribed for a location."

The fact of discovery being in favor of the Oregon claim, the next question was: What were the boundaries of that claim to which this discovery related?

Upon that question the plaintiffs contend, first, that it was proven conclusively that the Oregon boundaries had never been marked on the ground plainly or otherwise prior to the Allen survey in August, 1906, when the claim was made to cover the ground in dispute; that prior to that time the rights of plaintiffs to that ground had intervened by the location of the Liberty claim in May, 1906; but no discovery was made on that claim until October 9 or 10, 1906, and the law fixes the latter date as the day of location of the claim with respect to all parties who have made the discoveries provided by law within the boundaries of legal bona fide overlapping claims. A possessory title to a mining claim can only be acquired by valid location, an essential of which is the discovery of mineral thereon; and where the locators of two association claims, which overlap, are sinking shafts at the same time, the first to discover mineral has priority of right, although the location was staked after the other, if it was made openly and peaceably. Hanson v. Craig, 170 Fed. 62, 95 C. C. A. 338.

The plaintiffs contend that the evidence shows further that the boundaries of the Oregon claim were changed by the survey made of that claim in August, 1906, from what they were in June, 1905, for the purpose of taking in that part of the Liberty claim embraced in the land in dispute, and that, as in the former case, the rights of the plaintiffs had intervened by the location of the Liberty claim in May, 1906. But here again the plaintiffs are met by the law that discovery fixes the date of location with respect to all parties who have made the discoveries provided by law within the boundaries of overlapping claims. This was sufficient to dispose of the question of mere priority as between these two claims; but the question of the good faith of the defendants in staking the Oregon claim remained to be determined, and they introduced testimony tending to show that they staked that claim as early as June, 1905. That is to say, they undertook to show the origin of their right of possession, and the plaintiffs took issue upon the question as to whether the staking of the Oregon claim in June, 1905, marked the boundaries of that claim so that they could be traced upon the ground; and upon that question the court instructed the jury that it was immaterial whether the original marking of the Oregon claim was sufficient to make the boundaries readily traceable or not, providing that the perfected marking of the Oregon claim in August, 1906, was made peaceably, and not clandestinely, surreptitiously, or fraudulently. Whether the staking of the Oregon claim, so that its boundaries could be readily traced upon the ground, had been made openly and peaceably, and not clandestinely, surreptitiously, or fraudulently, being an issue in the case, the claim of the defendants that they had staked this identical claim as early as June, 1905, and had staked it so that the boundaries marked upon the ground could be readily traced, became an important

question of fact, and they introduced testimony tending to establish that fact.

It appears that one J. H. Sanford was the person who staked the Oregon claim in June, 1905. He was called by the defendants as a witness, and testified substantially as follows:

In marking the boundaries of the claim on the 16th of June, 1905, he set an upper center stake, as "the initial stake." It was a stake at least six feet high, and four inches square. He wrote on it, "We, the undersigned, claim 160 acres for placer mining purposes, 1,320 feet on each side of this stake," and the names of the locators: A. N. Gould, A. P. MacArthur, H. W. Sanford, N. P. Hill, M. J. Foley, B. W. Piper, John Macdonald, and A. McKinnon. That stake, he testified, is still standing. He then blazed a line and stepped it as near as he could 1,320 feet in a southeasterly direction, and set the southeast corner stake. He chopped a tree down about five feet high, blazed it down on four sides, and wrote the names of the locators and location on it. Besides the names of the locators, he wrote:

"We, the undersigned, claim 160 acres for placer mining purposes, 2,640 feet downstream and 1,320 feet to the initial stake."

He put an arrow on the stake pointing towards the initial stake and one pointing down the creek. From the center stake for about 400 feet there was no timber, only scattered scrub trees. The rest of the way on the timber was quite heavy. After he reached the timber, he blazed the trees along the course with an axe, taking the bark off on the sides. He went down the creek about the center of the ground, and there he put in a lower center stake. He cut a green tree off and blazed it down on three sides. He wrote a location notice, and on the stake he wrote:

"We, the undersigned, claim 160 acres for placer mining purposes, described as follows: 1,320 feet on each side of this stake, and 2,640 feet upstream."

He testified that at the time of giving his testimony this stake was still standing; that it had not been changed or altered in any way since it was placed there in 1905; and that it was there at the time of the Allen survey. After establishing the lower center stake, he blazed from this stake both up and down the hill; up the hill about 1,320 feet, and down the hill about 1,320 feet. Up the hill he set the northeast corner stake. It was a tree, cut off about five feet high, four inches square, and blazed on four sides. He saw that stake last in 1909, when he was out there working, and he saw it at the time of the Allen survey. The stake at that time was very badly burnt. He wrote on that stake:

"We, the undersigned, claim 160 acres for placer mining purposes," describing the distance, "1,320 feet down" to this (center) stake, and "2,640 feet up stream."

He then turned to the lower center stake and stepped the line down the hill until he struck the lake. He blazed some trees close up to the lake and walked around the lake and started a straight line

across from the lake, and blazed it close up to the creek (Vault creek), and set his northwest corner stake. He wrote upon that stake:

"We, the undersigned, claim 160 acres for placer mining purposes," the names of the locators, and, "1,320 feet to the center stake and 2,640 feet up stream."

After setting the northwest corner stake, he started to blaze up the creek. He blazed up part way that evening. It was raining very hard that day. It had been raining all day, and he was soaking wet, and it was along in the afternoon, and he quit and went home. He came up to a stake (which the context of his testimony indicates was the initial upper middle stake). He stepped it off as near as he could 1,320 feet and set the southwest corner stake. On this stake he wrote:

"We, the undersigned, claim 160 acres for placer mining purposes," the names of the locators and the date, and "2,640 feet downstream by 1,320 across the creek to the initial stake."

He numbered all the stakes. No. 1 was the initial stake; No. 2 was the southwest corner stake; No. 3 the northwest corner stake; No. 4 was the center stake; No. 5 the northeast corner stake; No. 6 was the southeast corner stake. The witness was asked if those numbers were still upon the stakes at that time. He answered:

"No, they are burnt off of those two stakes—the northeast corner stake and the southeast corner stake."

He testified that at the time of the Allen survey there had been a fire through there. All the timber lying around for quite a distance was all burnt black. The stake was all charred black, but it was smooth; could see the writing on it by the aid of a magnifying glass. Allen had a glass and took the glass out and looked it over very carefully and read the location on the stake. The writing on the northeast corner stake was burnt so that it was hardly distinguishable. After establishing these stakes and blazing these lines, a person seeing the stakes and the notice written upon them and the blazed lines could have easily determined what the boundaries of the claim were. The boundaries of the claim as thus staked, with the distances as stated, inclosed 160 acres. But there was testimony tending to show that the east line was 3,513.3 feet long, and the west line 3,360 feet long, with an average width of 2,200 feet, and that these boundaries actually inclosed 178 acres. But there was an overlap on the north end with the Isabells Association claim. This was an older location, and it was conceded that it had the right of possession of the overlapping area amounting to 23.6 acres. This overlap reduced the area of the Oregon claim to 154.4 acres. The western boundary of the Oregon claim, according to the testimony of Sanford, was on the right bank of Vault creek, except at the southwest corner, which was located on the left bank of the creek. There was testimony tending to show that this western boundary line as originally staked by Sanford was wholly on the left bank, but that in June and July, 1906, a pay-streak was found in claims both above and below the Liberty and Oregon claims, and it was believed that this pay-streak in due

course would probably cross the westerly end of the Liberty claim, and thereupon it is claimed the Oregon Association abandoned the location on the west side of Vault creek except the southwest corner and shifted the location to the east so as to cover the supposed pay-streak, and that the survey made of the Oregon claim in August, 1906, was for that purpose and caused the overlap in controversy, and that while the first discovery of gold on the disputed overlapping ground was made by the Liberty claimants on October 10, 1906, the first discovery of gold on that particular ground by the Oregon claimants was not made until June or July, 1907.

Upon this phase of the testimony the plaintiffs asked the court to instruct the jury, among other things, in substance, that if they found that the Liberty claimants marked the boundaries of the Liberty claim on the ground in such manner that they could be readily traced and thereafter made the first discovery of gold in the disputed strip, then the right of the Liberty claimants to that ground would prevail over the Oregon claimants. The court, accordingly, instructed the jury that:

"If you find and believe from the evidence that the Oregon Association claim as originally staked did not include the tract of mining ground in controversy, and that the 'Allen survey' changed the original boundaries of the said Oregon Association claim so as to include the tract of mining ground in controversy, then the defendants cannot prevail in this action, unless you further find that they made a discovery of gold within the limits of the disputed tract prior to the time the plaintiffs made a discovery of gold on the Liberty Association claim—if you find the plaintiffs ever made such discovery on said claim. That is, whatever discovery of gold, if any, was made by the defendants in their first shaft, could and would only give life to the Oregon Association claim as originally bounded; and if you find, as before stated, that it did not originally include the strip of mining ground in controversy, before the defendants made any rights in and to said strip of mining ground, it would be necessary for them to show that they made a discovery of gold within the limits of such disputed tract before the plaintiffs made a discovery on the said Liberty Association claim."

To this instruction the plaintiffs, of course, make no objection, as it was in their favor. But they contend that, while it was "the only tangible intelligible statement of the law of the case as applied to the evidence to be found in the instructions," it was of no avail to them for the reason that there was no evidence that the boundaries of the Oregon claim had been extended so as to make defendants intruders upon the disputed ground under the law as declared by this court in Biglow v. Conrandt, 159 Fed. 868, 87 C. C. A. 48. There was evidence tending to show a change of boundaries, and we fail to discover the difference between evidence tending to show a "change" of boundaries referred to in the instruction, and evidence teding to show the "extension" of boundaries referred to by this court in Biglow v. Conrandt.

[6] If the evidence is sufficient to show that a change or extension of boundaries of a claim has been made by a locator for the fraudulent purpose of obtaining possession of adjoining ground located in good faith by another, the change or extension of boundaries must fail in either case for the reason that, as stated in the case referred

to, the entry upon ground by a locator without a superior right for the purpose of appropriating, by an overlapping location, makes him an intruder upon the other claim; and there is no reason why upon the instruction of the court in this case the jury should not have found the defendants intruders upon the disputed ground had they deemed the evidence in that respect sufficient.

[7] What has been said with respect to these instructions..applies to the objections made to the other instructions given and the refusal to give instructions requested. In our opinion the instructions of the court stated the law correctly when read in the light of the testimony and in consideration of its various phases.

[8] It is further objected that the court refused to give instructions to the jury that the location of the Oregon claim was what is called in the law a "dummy location," as defined by this court in Cook v. Klonos, 164 Fed. 529, 90 C. C. A. 403; Id., 168 Fed. 700, 94 C. C. A. 144. The question of fraud based upon such a location was not made an issue in the pleadings in this case, as in Cook v. Klonos. It was therefore not a question upon which instructions should have been given.

[9] As stated in Moss v. Riddle, 5 Cranch, 351. 357, 3 L. Ed. 123:

"Fraud consists in intention. and that intention is a fact which ought to have been averred, for it is the gist of the plea, and would have been traversable."

In Wetherly v. Straus, 93 Cal. 283, 286, 28 Pac. 1045, 1046, the court said:

"Fraud is never to be presumed, and, whenever it constitutes an element of a cause of action or of a defense which is of an affirmative nature, and invoked as conferring a right against the opposite party, it must be alleged."

In Coos Bay R. & E. & Nav. Co. v. Siglin, 26 Or. 387, 38 Pac. 192, referring to former decisions of the court, Judge Wolverton, speaking for the court, said:

"An instruction upon matters not put in issue by the pleadings is erroneous and furnishes cause for reversal."

And in Muldoon v. Brown, 21 Utah, 121, 59 Pac. 720, the court said:

"Fraud, when relied upon as a defense, must be specifically pleaded in an answer as well as in a complaint; and the facts and circumstances relied upon should be set out, in order that the court may know whether there was such fraud as will be of avail to the pleader, and also that the party charged with fraud may know the nature of the charge, and be prepared to meet it."

The questions at issue as presented by the pleadings having been submitted to the jury with proper instructions. we find no error in the record, and the judgment must therefore be affirmed, and it is so ordered.